1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

8

**FOR THE WESTERN DISTRICT OF WASHINGTON**

9

10

ANITA ADAMS,

Case No. _____

v.

11

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

CITY OF SEATTLE, WASHINGTON, a municipal corporation

12

13

14     1.     This civil-rights lawsuit challenges provisions of the city of Seattle's (the "City"

15  or "Seattle") ordinance implementing what it calls the Mandatory Housing Affordability

16  program ("the MHA program" or "MHA"). MHA conditions a person's ability to receive a

17  permit to construct new housing on either making a cash payment to the City (to be deposited in

18  the City's public housing fund) or agreeing to construct and provide "affordable housing" units

19  for up to seventy-five years.[1]

20     2.     MHA's costs do not reflect the effect a particular development will have on

21  affordable housing in Seattle, however. Instead, the costs reflect a "Grand Bargain" between the

22  City and "major players" (*i.e.*, large developers), in which the City agreed to "upzone" (*i.e.*,

23  increase height/density allotments) areas across Seattle and, in exchange, developers would

24  either pay the City cash or otherwise agree to construct and provide "affordable housing" as a

25  permit condition of any new housing project.

26

27  _____

[1] MHA applies to commercial properties as well as residential properties, but this lawsuit only
challenges the portion of the program that applies to residential properties.

28

**COMPLAINT** - 1

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

3.      As the City itself has admitted on multiple occasions, the amount to be paid or provided is based on the "value" of the upzoning, rather than on the impacts, if any, of the proposed development upon any need for public housing.

4.      However, the U.S. Constitution requires impact fees, like MHA, to be related and proportionate to the actual effects a project has on a city. Otherwise, the government is simply coercing money or property out of people just because they want to build something.

5.      Under MHA, the City charges people for building on their own property and not for any harm or extra burden caused by that construction. This coercive penalty violates the Fifth and Fourteenth Amendments to the U.S. Constitution.

6.      Plaintiff Anita Adams ("Ms. Adams" or "Plaintiff"), a longtime government employee and a Seattle homeowner, is subject to the City's MHA demands.

7.      Ms. Adams, who owns her own single-family home, has been trying to build additional housing on her own property—a second house containing four small "dwelling units"—for her own family, who lost access to housing during the COVID-19 pandemic.

8.      However, because her lot is in a zone to which MHA applies, the City conditions Ms. Adams's ability to obtain the requisite building permit on her providing the City with property. In exchange for allowing Ms. Adams to build her desired four-unit house for her family, the City requires that she either pay approximately $77,000 into the City's housing fund, or otherwise agree to construct and provide another two "affordable housing" units, which she must continue to provide as rentals for up to seventy-five years.

9.      Although Ms. Adams can afford to construct the project, she cannot afford the costs of construction and the MHA program's permit requirements.

10.     Therefore, MHA effectively prohibits Ms. Adams from building housing in Seattle for her own family, on her own property.

11.     The U.S. Supreme Court has recognized that the "unconstitutional conditions" doctrine prohibits extortionate demands of this sort—where a government demands money or

**COMPLAINT** - 2

additional building as a land-use permitting condition that lacks an "essential nexus" with, and a "rough proportionality" to, the social costs of the person's project.

12.     Because of her project's small size, there is and can be no "essential nexus" and "rough proportionality" about Ms. Adams's desired housing for her family and the need for additional public housing in the city.

13.     Even if there were an "essential nexus" between Ms. Adams's desired housing and a need for additional public housing in Seattle, the costs MHA imposes on Ms. Adams does not reflect that impact—they are just coercive exactions of money or property with no relationship to the actual effect of any given project, including Ms. Adams's.

14.     Therefore, the City's ordinance, on its face and as applied to Ms. Adams, violates the Due Process Clause of the Fourteenth Amendment, which incorporates, amongst other things, the Fifth Amendment's prohibition on uncompensated governmental takings of private property.

## JURISDICTION AND VENUE

15.     Plaintiff brings this civil-rights lawsuit under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201–02.

16.     Plaintiff seeks declaratory and injunctive relief against the City's enforcement of Seattle Municipal Code ("SMC") §§ 23.58C.005–.055, on its face and as applied to Plaintiff.

17.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

18.     Venue lies in this Court under 28 U.S.C. § 1391(b)(1)–(2).

## THE PARTIES

19.     Plaintiff Anita Adams is a citizen of the United States and a resident of the City of Seattle, Washington.

20.     Defendant City of Seattle is a municipal corporation located in King County, Washington.

**COMPLAINT** - 3

1

## FACTUAL ALLEGATIONS

2

**A.     PLAINTIFF ANITA ADAMS AND HER FAMILY.**

3

21.     Plaintiff Anita Adams was born in Seattle nearly five decades ago.

4

22.     Both Ms. Adams and her husband are longtime government employees. They are

5

not wealthy, nor do they undertake large development projects.

6

23.     After many years of saving, Ms. Adams was able to purchase a home in her

7

childhood neighborhood, at 2437 South Judkins Street, Seattle, Washington 98144, more than

8

twenty years ago. It is a single-family home, and Ms. Adams lives there with her husband and

9

father-in-law.

10

24.     Ms. Adams is the only Seattle homeowner in her or her husband's extended

11

family.

12

25.     In spring 2020, due to the COVID-19 pandemic, Ms. Adams's two children were

13

forced to leave their college dorms.

14

26.     For months, both Ms. Adams's son and daughter slept in her basement.

15

27.     Some of Ms. Adams's close relatives lost their home during the COVID-19

16

pandemic and lack regular access to shelter.

17

28.     Ms. Adams's husband suggested that they build an additional house on their lot,

18

for their family's use. Ms. Adams loved the idea, which would allow her children a home in the

19

city, and which would provide her other family members with housing.

20

29.     Seattle zoning allows for construction of additional dwelling units on Ms.

21

Adams's lot.

22

30.     Ms. Adams planned to build a single, four-unit structure of approximately 2,200

23

square feet on her lot, next to her house.

24

31.     Ms. Adams would like to house her family in her new structure: One unit would

25

be for each of her children; one unit would be for her in-laws; and one unit would be for other

26

family members.

27

28

**COMPLAINT** - 4

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

32.     To pay some of her construction debts, Ms. Adams might have to rent out one of the new units for a maximum of a few years.

33.     Ms. Adams's desired house would cost at least $800,000 to design and construct.

34.     Ms. Adams and her family can pool together their resources to obtain just enough financing to cover those costs.

35.     But Ms. Adams's lot is in a zone to which the City has applied the MHA program, making her plan effectively impossible because of the additional costs.

**B.     THE FEES AND BUILDING CONDITIONS IN MHA DO NOT REFLECT THE EFFECTS OF A PROJECT, BUT WERE INSTEAD A POLITICAL CALCULATION RESULTING FROM A "GRAND BARGAIN" BETWEEN "MAJOR PLAYERS"**

36.     In July 2015, the Seattle Mayor's Office released a "Statement of Intent for Basic Framework for Mandatory Housing," which the City itself referred to as a "Grand Bargain" between the City and "major players," including representatives of large real-estate developers. *See* Grand Bargain Memorandum, July 13, 2015, https://www.seattle.gov/Documents/ Departments/HALA/HALA%20Grand%20Bargain.pdf.

37.     As part of that "Grand Bargain," the City agreed to work toward "upzoning" areas of Seattle for higher density/height allotment, and, in exchange, large developers agreed to build and provide "affordable housing" (*i.e.*, below-market rental or sale units), or pay in-lieu fees, as a condition of any permit to construct housing.

38.     The "Grand Bargain" specified that the new program would calculate the requisite amount of "affordable housing" and in-lieu fees to capture "the value of this available increment [*i.e.*, of the additional density/height allotment, which] would be paid towards affordable housing whether or not the increment was used."

39.     That is, the amount of fees or building obligations imposed through MHA reflects a political calculation and does not reflect the social or other costs caused by any particular project.

40.     The "Grand Bargain" also included "[c]ommitment from 'major players' to not pursue legal action [against] Mandatory Inclusionary Housing."

**COMPLAINT** - 5

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

41.    On the same day that it signed its "Grand Bargain," the mayor and City Council (through an appointed committee) released a report outlining the proposed MHA program. *See* Final Advisory Comm. Recommendations to Mayor Edward B. Murray and the Seattle City Council, July 13, 2015 ("HALA Report"), https://www.seattle.gov/documents/ departments/hala/policy/hala_report_2015.pdf.

42.    That report, in accordance with the City's "Grand Bargain" with "major players," stated that the City would upzone areas across Seattle and, in exchange, the City would demand an "[a]mount of affordable housing required (and in-lieu fees) [] based on value of upzones." HALA Report, Appendix E.

43.    In March 2019, the Seattle City Council passed CB 119433, which implemented the proposed MHA in zones citywide.

44.    Local news reports readily noted that the amount of MHA's obligations was "in exchange for [] increased density." *See, e.g.*, Josh Cohen, *Council Approves a Taller Denser Seattle. What Does That Mean for Housing?*, Crosscut (Mar. 18, 2019), https://crosscut.com/2019/03/council-approves-taller-denser-seattle-what-does-mean-housing.

45.    Accordingly, under MHA, whenever the City increases a zone's density and/or height allotment, MHA conditions automatically begin to apply to all master-use permits for additional housing. *See* Seattle Municipal Code ("SMC") § 23.34.006. *See also* SMC § 23.58C.025.B.

46.    Once MHA applies to a zone, permittees seeking to construct housing must agree to satisfy MHA obligations through either a "payment option" or a "performance option." SMC § 23.58C.025.A.

47.    The "payment option" requires that the permittee "provide a cash contribution to the City," to be deposited into the City's public housing fund. *See* SMC § 23.58C.040.A.1.

48.    The "performance option" requires that the permittee agree to construct a certain number of additional dwelling units and provide them as below-market "affordable housing"

**COMPLAINT** - 6

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

rental units, with affirmative obligations lasting up to seventy-five years. *See* SMC § 23.58C.050.A–.B.

49.     The amount of cash payment required to satisfy MHA's "payment option" is calculated by multiplying the square footage of the proposed development's gross floor area by a dollar amount that the City has assigned to each zone. SMC § 23.58C.040.A.

50.     The amount of new "affordable housing" units required to satisfy MHA's "performance option" is calculated by multiplying the proposed development's total number of units by a value that the City has assigned to each zone. SMC § 23.58C.050.

51.     Satisfying MHA's "performance option" requires constructing and providing at least two additional dwelling units (or one three-bedroom unit) for "affordable housing," no matter how small the proposed development might be. SMC § 23.58C.050.A.2.

52.      To the extent that these formulas differ from zone-to-zone, the difference reflects the relative market value of upzoning. As the City noted, the "[a]mount of affordable housing required (and in-lieu fees) is based on value of upzones, and varies by market and construction type." HALA Report, Appendix E.

53.     Each subsequent time that the City increases a zone's density/height allotment, the zone's MHA variable (*i.e.*, the dollar amount per-square-foot or the fraction used to determine the required number of extra "affordable housing" units) increases accordingly to reflect the value of the upzoning. *See* SMC § 23.34.006.

54.     For example, in a zone with an (M) suffix, a permit to build a house might cost roughly $24-per-square-foot in MHA fees. Were the City to upzone the area, the zone's suffix would change to (M1), and a permit to build precisely the same house would cost roughly $35-per-square-foot. *See* https://www.seattle.gov/sdci/codes/codes-we-enforce-(a-z)/mandatory-housing-affordability-(mha)-program (displaying tables for calculating MHA by zone location and density).

55.     Although MHA might have been a "Grand Bargain" for large developers and wealthy residents seeking increased luxury housing options, it cost other Seattleites dearly.

**COMPLAINT** - 7

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

56.     Large developers can absorb the costs of MHA's permitting conditions, then pass those costs onto wealthy buyers and renters.

57.     Small developers are often, if not always, unable to absorb the costs of MHA's permitting conditions and pass them onto residents.

58.     MHA's conditions increase the cost of constructing or renting a home, rendering it more difficult for middle- and lower-income people to live in the City.

59.     The City predicted that this would happen before it passed MHA.

60.     In 2016, the City commissioned a technical report to "evaluate[] the economic viability of new development with the zoning changes and proposed payment or performance requirements associated with MHA." HALA Economic Analysis Summary Memorandum, Nov. 29, 2016 ("HALA Economic Analysis"), https://www.seattle.gov/documents/ Departments/HALA/Policy/2016_1129%20CAI%20HALA%20Economic%20Analysis%20Summary%20Memorandum.pdf, at 1.

61.     The report concluded that MHA would depress the construction of new housing "[i]n low market areas," that is, in the bottom third of the housing market. HALA Economic Analysis at 3.

62.     In fact, the report found that "nearly all development prototypes [in low-market areas] appear challenged" and "will need to attain above-market rents in these areas to be feasible." *Ibid.*

63.     On the other hand, the report concluded that "[i]n high market areas [*i.e.*, the top third of the housing market], results indicate generally good prospects for project feasibility." *Ibid.*

64.     Unlike other impact-housing permitting programs across the country, the MHA program has no minimum threshold for its application—meaning that its permit conditions apply with equal force and utilize the same calculation within each zone in Seattle, regardless of whether the permit applicant is a luxury developer or a small-time homeowner, whether she is building four units or four hundred.

**COMPLAINT** - 8

65.    Put another way, through the MHA program, the City is treating all property owners as if they were large, high-end developers, despite knowing ahead of time that this would exacerbate housing shortages in the lower end of the market.

66.    Many property owners across Seattle, unlike the "major players" who can afford MHA, did not sign on to the City's "Grand Bargain."

67.    The City did not invite them to participate.

68.    Nevertheless, they must pay the costs of the MHA program.

69.    As a result, the City has increased the availability of luxury housing at the expense of increasing the price of low-market housing (and, accordingly, low-market rents).

C.    **MS. ADAMS'S PLAN TO BUILD A HOUSE FOR HER FAMILY IS IMPOSSIBLE BECAUSE OF MHA'S APPLICATION TO HER PROPERTY.**

70.    To begin her project to build a house with four dwelling units for her family, Ms. Adams met with a friend who is a local architect.

71.    That architect offered to draw up Ms. Adams's plans and prepare a permit application at a discount.

72.    The architect estimated that her discounted services would cost at least fifty thousand dollars.

73.    That estimation is consistent with estimates from multiple other architects, who agreed that the market price for drawing up Ms. Adams's plans and preparing the permit application would cost between fifty and seventy thousand dollars.

74.    Ms. Adams estimates that the cost of construction of her project—materials, labor, etc.—will be at least $750,000, in addition to architect and permitting fees.

75.    By pooling together their resources and refinancing their house, Ms. Adams and her family can access just enough funds to cover those costs.

76.    Ms. Adams's lot, however, is in an MHA zone and is therefore subject to additional permitting conditions.

**COMPLAINT** - 9

77.     In Ms. Adams's zone, obtaining a permit for any new housing requires satisfying MHA conditions, either through its "payment option" or "performance option."

78.     In Ms. Adams's zone, MHA's "payment option" requires paying a fee of roughly $35 per square foot of the proposed development's gross floor area. *See* SMC § 23.58C.040(A).

79.     For Ms. Adams's desired project, that would total to roughly $77,000 in MHA fees—which Ms. Adams would be required to pay the City before she may break ground.

80.     Ms. Adams cannot afford those fees and cover the costs of planning and construction.

81.     If the City were to increase the height/density requirements in Ms. Adams's zone, satisfying MHA's "payment option" would then require paying a fee of roughly $39 per square foot of the proposed development's gross floor area. *See* SMC § 23.58C.040(A).

82.     In that case, the amount of MHA permitting fees for Ms. Adams's desired project would increase to roughly $86,000 in MHA fees—notwithstanding that the project would be the same house.

83.     Likewise, the calculation for determining the requisite number of "affordable housing" units that must be constructed and provided to satisfy MHA's "performance option" for building permits in Ms. Adams's zone reflects that zone's current height/density allotments and would increase if the area were upzoned. *See* SMC § 23.58C.050.

84.     However, because of the small size of Ms. Adams's desired project, satisfying MHA's "performance option" in her case requires constructing and providing the minimum of two "affordable housing" units (or one three-bedroom unit). *See* SMC § 23.58C.050.A.2.

85.     Ms. Adams cannot afford to construct and provide an additional two "affordable housing" units and cover the costs of construction for the four units she wants to build for her family.

86.     MHA's conditions, as the City has admitted, are not designed to reflect, and do not reflect, anticipated social impacts of that house.

**COMPLAINT** - 10

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

1

**D.    MS. ADAMS ASKS THE CITY TO WAIVE MHA'S CONDITIONS**

2        87.    On August 8, 2022, Ms. Adams wrote an e-mail to the Seattle Department of

3  Construction and Inspections ("SDCI") to explain her situation and to request that the City waive

4  MHA's conditions.

5        88.    Ms. Adams explained that she wished to build a single structure "to house

6  members of [her] family," but that she could not "afford to build the structure [they] want on

7  [their] lot if [she] must pay the full amount of the MHA."

8        89.    Ms. Adams noted that she could not afford to pay the costs of compiling a permit

9  application "only to find out that Seattle would not waive MHA's applicability to [her] project,"

10  but "[i]f [she] could obtain a waiver now, then [she] would proceed to pay for [her] permit

11  application."

12        90.    The next day, Land Use Planner Katrina Nygaard responded to Ms. Adams's

13  request. She stated that Ms. Adams could request a waiver only while submitting her permit

14  application, and "[SDCI] can't give any assurance that your request to waive or modify the MHA

15  requirements would be approved. These requests are rare and the burden of proof you'd have to

16  provide to meet the criteria can be difficult."

17        91.    Compiling a permit application would require that Ms. Adams pay an architect at

18  least fifty thousand dollars.

19        92.    Unless the City then agrees to waive MHA, Ms. Adams would have spent at least

20  $50,000 on architectural plans yet be unable to afford the costs of permitting fees and

21  construction. In other words, she would have spent at least fifty thousand dollars for the privilege

22  of being told, "no."

23        93.    That expenditure would be far more than Ms. Adams, a middle-class government

24  employee, can afford to lose.

25        94.    The only basis for waiving MHA's conditions that could apply to Ms. Adams is

26  waiver based on "severe economic impact." SMC § 23.58C.035.C.

27

28  **COMPLAINT** - 11

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

1    95.    In determining whether to grant that waiver, the City looks to factors including

2    the "severity of the economic impact," the "degree to which the [MHA] requirements . . . were or

3    could have been anticipated," the "extent to which alternative uses of the property or

4    configurations of the proposed development would alleviate the need for the requested waiver or

5    reduction," the "extent to which any economic impact was due to decisions by the applicant

6    and/or property owner," and "[o]ther factors relevant to whether the burden should be borne by

7    the property owner." SMC § 23.58C.035.C.4.

8    96.    Ms. Adams would bear the burden of demonstrating a "severe economic impact."

9    SMC § 23.58C.035.3.

10   97.    The City has waived MHA requirements based on "severe economic impact" only

11   one time since the City implemented the MHA program.

12   98.    Ms. Adams cannot afford risking tens of thousands of dollars preparing her permit

13   application in hopes that the City will waive her MHA requirements.

14   **E.    MS. ADAMS'S FAMILY IS FORCED OUT OF SEATTLE.**

15   99.    Because the MHA permit conditions create untenable risks to her financial

16   circumstances, Ms. Adams has been and is unable to move forward with constructing a house for

17   her family.

18   100.   Ms. Adams's children, unable to afford Seattle rent or to remain living in their

19   parents' basement indefinitely, had to move out of Seattle city limits and endure long commutes

20   to their employment.

21   101.   Other members of Ms. Adams's family remain without access to regular shelter in

22   Seattle.

23   102.   If Ms. Adams were allowed to build her desired house, she would use it to house

24   her children and other family members.

25   103.   Ms. Adams is a proud member of the local African American community.

26   104.   Other members of Ms. Adams's community are similarly unable to construct

27   housing for themselves and their families because of the City's MHA permit conditions.

28

**COMPLAINT** - 12

105.    Like her children, other members of Ms. Adams's community are unable to afford the cost of Seattle rent in part because of the City's MHA permit conditions.

106.    The City's MHA permit conditions exacerbate housing shortages for middle- and lower-income individuals across Seattle.

107.    The City's MHA requirement that property owners either pay a per-square-foot fee or otherwise construct and provide "affordable housing" units as a condition of any new housing permit violates Ms. Adams's right to property not being taken without due compensation.

**INJURY TO PLAINTIFF**

108.    Ms. Adams wants to construct a house containing four dwelling units next to her current house, for her own family's use.

109.    To build this house, Ms. Adams must obtain a permit from the City, but that permit is subject to conditions under MHA.

110.    Because MHA applies to Ms. Adams's property, the City requires Ms. Adams to either pay a large cash sum or construct and provide two "affordable housing" units; otherwise, she cannot obtain the necessary permit to build her desired house for her family.

111.    Ms. Adams cannot afford that permit condition, which even for her small project would require either depositing a lump sum of roughly $77,000 into the City's public-housing fund or otherwise constructing and providing two "affordable housing" units for up to 75 years.

112.    The City will not consider waiving those conditions unless Ms. Adams submits a formal request alongside her full master-use permit application.

113.    To prepare a master-use permit application, Ms. Adams would need to pay an architect at least fifty thousand dollars.

114.    As a middle-class government employee, Ms. Adams cannot risk anywhere near that much money in hopes that the City would grant her waiver request—particularly when the City has granted such a request on only one occasion and, in the City's own words, obtaining a waiver would be "difficult."

**COMPLAINT** - 13

115.    But for the burden MHA places on her property, Ms. Adams would proceed with her permit application and construct her desired house with four dwelling units for her family.

116.    But for the burden of MHA's conditions on Ms. Adams's property, Ms. Adams's children would have a home inside the City and would move back to live in Ms. Adams's new house.

117.    But for the burden MHA places on Ms. Adams's property, Ms. Adams's other family members would have access to regular shelter in Seattle, as they could stay in Ms. Adams's new house.

## CONSTITUTIONAL VIOLATIONS

### Count I
**Fifth and Fourteenth Amendments to the U.S. Constitution**
**(As Applied—Unconstitutional Conditions; Taking of Private Property Without Just Compensation)**

118.    Plaintiff adopts and realleges the allegations contained in paragraphs 1 through 117, inclusive.

119.    The Fourteenth Amendment's Due Process Clause incorporates, among other things, the Fifth Amendment's guard against government takings of private property absent just compensation.

120.    The City, acting under color of law, caused Plaintiff's property to be burdened by land-use permit condition demands for property, including money, which lack an essential nexus and rough proportionality to the effects of the proposed new use for the specific property at issue, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

121.    Conditions placed on land-use permits that lack either an essential nexus or rough proportionality to the social costs of the proposed new use of the specific property at issue unconstitutionally burden the incorporated right not to have property taken without just compensation.

**COMPLAINT** - 14

122.    It is the government's burden to demonstrate that its land-use permitting conditions share an essential nexus with, and a rough proportionality to, the likely social costs (or impacts) as applied to any given proposed development.

123.    By "essential nexus," the government must demonstrate that its permit condition would "substantially advance" the same legitimate end that would furnish a reason for categorically denying the desired land use.

124.    By "rough proportionality," the government must make an "individualized determination" that the nature and amount of its permit obligations reflects the likely impacts of the specific proposed development.

125.    The City has unconstitutionally burdened Ms. Adams's right not to have property taken without just compensation by conditioning the use of her property with obligations that lack both an essential nexus with, and a rough proportionality to, the likely impacts of the proposed new property use.

126.    There is no house that Ms. Adams could possibly build for her own family on her own property that would share an "essential nexus" with public-housing impacts.

127.    There is no house that Ms. Adams could possibly build for her own family on her own property for which MHA's formula or process would demonstrate a rough proportionality between its permit obligations and the impacts of the proposed development.

128.    As the City has admitted, MHA's formula for calculating permit obligations is not designed to capture housing impacts but, instead, reflects the value of recent upzoning.

129.    Therefore, as applied to Ms. Adams, MHA's formula for calculating the nature and extent of its permit conditions fails to demonstrate a "rough proportionality" between the nature and extent of those conditions and the impacts of any given development.

130.    That failure is exacerbated by the City's refusal to include: any minimum threshold in MHA's application (such as a minimum project size or dollar-value below which MHA's conditions would not apply); any basis for waiver citing a lack of proportionality between the operation of the formula and the anticipated effects of the proposed development;

**COMPLAINT** - 15

1  and any way of obtaining a waiver based on "severe economic impact" *before* first spending tens

2  of thousands of dollars compiling a permit application.

3       131.    The City's provisions calculating and applying MHA residential permit

4  conditions, SMC §§ 23.58C.005–.055, as applied to Ms. Adams, unconstitutionally burdens the

5  right to private property not being taken without just compensation, as incorporated by the Due

6  Process Clause of the Fourteenth Amendment.

7       132.    Unless the provisions set forth above are declared unconstitutional and

8  permanently enjoined, Plaintiff will continue to suffer great and irreparable harm.

9

10  

**Count II**
**Fifth and Fourteenth Amendments to the U.S. Constitution**
**(Facial—Unconstitutional Conditions; Taking of Private Property Without Just**
**Compensation)**

11

12       133.    Plaintiff adopts and realleges the allegations contained in paragraphs 1 through

13  117, inclusive.

14       134.    The Fourteenth Amendment's Due Process Clause incorporates, amongst other

15  things, the Fifth Amendment's guard against government takings of private property absent just

16  compensation.

17       135.    The City, acting under color of law, caused those developing property in the City

18  to be burdened by land-use permit condition demands for property, including money, that lack an

19  essential nexus and rough proportionality to the effects of the proposed new use for the specific

20  property at issue, in violation of the Due Process Clause of the Fourteenth Amendment to the

21  United States Constitution.

22       136.    Conditions placed on land-use permits that lack either an essential nexus or rough

23  proportionality to the social costs of the proposed new use of the specific property at issue

24  unconstitutionally burden the incorporated right not to have property taken without just

25  compensation.

26

27

28  **COMPLAINT** - 16

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

137.    It is the government's burden to demonstrate that its land-use permitting conditions share an essential nexus with, and a rough proportionality to, the likely social costs (or impacts) as applied to any given proposed development.

138.    By "essential nexus," the government must demonstrate that its permit condition would "substantially advance" the same legitimate end that would furnish a reason for categorically denying the desired land use.

139.    By "rough proportionality," the government must make an "individualized determination" that the nature and amount of its permit obligations reflects the likely impacts of the specific proposed development.

140.    The City has unconstitutionally burdened the right of those building housing units in the City not to have property taken without just compensation by conditioning the use of their property with obligations that lack both an essential nexus with, and a rough proportionality to, the likely impacts of the proposed new property use.

141.    As the City has admitted, MHA's formula for calculating permit obligations is not designed to capture housing impacts but, instead, reflects the value of recent upzoning.

142.    By design, the City issues MHA permit obligations without ever demonstrating a rough proportionality between the nature and extent of those obligations and the impacts of any given development.

143.    Accordingly, there is no set of circumstances under which the City may demand MHA obligations as a condition of a permit to construct new housing.

144.    Likewise, MHA's conditions do not have a plainly legitimate sweep.

145.    Therefore, the City's MHA residential permit obligations fail on their face to demonstrate a "rough proportionality" between the nature and extent of those conditions and the impacts of any given development.

146.    That failure is exacerbated by the City's refusal to include: any minimum threshold in MHA's application (such as a minimum project size or dollar-value below which MHA's conditions would not apply); any basis for waiver citing a lack of proportionality

**COMPLAINT** - 17

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

between the operation of the formula and the anticipated effects of the proposed development; any way of obtaining a waiver based on "severe economic impact" *before* first spending tens of thousands of dollars compiling a permit application.

147.    The City's provisions calculating and applying MHA residential permit conditions, SMC §§ 23.58C.005–.055, on their face, unconstitutionally burden the right to private property not being taken without just compensation, as incorporated by the Due Process Clause of the Fourteenth Amendment.

148.    Unless the provisions set forth above are declared unconstitutional and permanently enjoined, Plaintiff and others will continue to suffer great and irreparable harm.

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    A declaratory judgment that, on its face and as applied to Anita Adams, the provisions of Seattle Municipal Code §§ 23.58C.005–.055, violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

B.    A permanent injunction prohibiting Defendants from enforcing Seattle Municipal Code §§ 23.58C.005–.055 against Ms. Adams or anyone else.

C.    $1.00 in nominal damages.

D.    Reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.    Such other legal or equitable relief as this Court may deem appropriate and just.

**COMPLAINT** - 18

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300

1    Dated: December 14, 2022                     Respectfully submitted,

2
                                                  /s/ William R. Maurer
3    Suranjan Sen* (TN Bar no. 038830)            William R. Maurer (WSBA No. 25451)
     INSTITUTE FOR JUSTICE                         INSTITUTE FOR JUSTICE
4    901 North Glebe Road, Suite 900              600 University Street, Suite 1730
     Arlington, Virginia 22203                    Seattle, Washington 98101
5    Phone: (703) 682-9320                        Phone: (206) 957-1300
     Facsimile: (703) 682-9321                    Facsimile: (206) 957-1301
6    Email: ssen@ij.org                           Email: wmaurer@ij.org
7    *pro hac vice application to be filed

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
     **COMPLAINT** - 19                           INSTITUTE FOR JUSTICE
                                                  600 University Street, Suite 1730
                                                  Seattle, WA 98101
                                                  Tel: (206) 957-1300

## **VERIFICATION**

I, Anita Adams, declare as follows:

I have personal knowledge of the facts set forth in paragraphs 21-35 and 70-105 of this complaint, and if called upon, I would competently testify to them.

I verify under penalty of perjury under the law of the United States of America that the factual statements in the above-listed paragraphs are true and correct.


Executed on December 13, 2022 in Seattle, Washington.

_____
Anita Adams

**COMPLAINT** - 20

INSTITUTE FOR JUSTICE
600 University Street, Suite 1730
Seattle, WA 98101
Tel: (206) 957-1300