UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ANITA ADAMS,

                Plaintiff,

  v.

CITY OF SEATTLE,

                Defendant.

C22-1767 TSZ

ORDER

THIS MATTER comes before the Court on cross-motions for summary judgment, docket nos. 27 and 34.  Having reviewed all papers[1] filed in support of, and in opposition to, the motions, and having concluded that oral argument would not be beneficial, the Court enters the following Order.

**Background**

Plaintiff Anita Adams and her husband own a house located at 2437 South Judkins Street in Seattle, Washington.  See Adams Decl. at ¶¶ 4–6 (docket no. 35).  The house is approximately 2,600 square feet in size, id. at ¶ 6, and sits on a 4,600-square-foot plot of

---

[1] In addition to the parties' submissions, the Court received briefs, docket nos. 43, 47-1, and 55-1, from, respectively, the Lawyers' Committee for Civil Rights Under Law, Pacific Legal Foundation, and Citizen Action Defense Fund, each acting as amicus curiae.  These materials did not, however, address the jurisdictional questions now before the Court.

ORDER - 1

1  land, see id. at Ex. 2 (docket no. 35-2 at 4).  The property is zoned LR1 (M1), id., which

2  means that low-rise multifamily structures may be constructed on the site, for example,

3  rowhouses or townhouses,[2] provided they comply with certain size, density, setback, and

4  other restrictions.  See Seattle Municipal Code ("SMC") Chapter 23.45.

5       As a result of the 2020 pandemic, plaintiff and her husband developed an interest

6  in building additional residences in the yard behind their house, with the purpose of

7  providing places for various family members, including adult children, to live.  See

8  Adams Decl. at ¶¶ 10–18 (docket no. 35).  Plaintiff identified an architect, Leah Martin

9  with the firm Allied8, who proposed to provide preliminary designs for between two and

10 four units, depending on configuration (i.e., townhouses either without or with ground-

11 floor apartments), that would add in the aggregate about 2,700 or 2,800 square feet of

12 living space.  See Exs. 1 & 2 to Adams Decl. (docket nos. 35-1 & 35-2).  Plaintiff and her

13 husband, however, never contracted with Martin to perform the work, and to date, the

14 project has not progressed past the conceptual phase.

15      Plaintiff alleges that she was hindered in her efforts by the City of Seattle's

16 Mandatory Housing Affordability for Residential Development ordinance (the "MHA"),

17 codified as SMC Chapter 23.58C.  The MHA was promulgated under authority granted to

18 the City of Seattle by the Washington Legislature in RCW 36.70A.540, which is part of

---

[2] Rowhouses are attached side by side, face the street, and have no housing units behind them, whereas townhouses may be located behind other townhouses on the same plot of land.  See Seattle Department of Construction & Inspections, "Seattle's Lowrise Multifamily Zones" (https://www.seattle.gov/documents/departments/SDCI/codes/multifamilyzoningsummary.pdf).

ORDER - 2

1  Washington's Growth Management Act ("GMA").  See SMC 23.58C.010.  Pursuant to
2  the GMA, a city may "enact or expand affordable housing incentive programs providing
3  for the development of low-income housing units through development regulations or
4  conditions on rezoning or permit decisions."  RCW 36.70A.540(1)(a).  The MHA
5  provides that, with respect to certain land use zones, including LR1 (M1), if an applicant
6  seeks a permit for construction of (i) a new structure, or (ii) an addition or alteration to an
7  existing structure that increases the total number of units on the property, the applicant
8  must comply with either the MHA's "performance option" or the MHA's "payment
9  option," unless a modification is requested and approved.  See SMC 23.58C.025 &.035.
10         The "performance option" entails developing within the structure for which a
11 permit is sought a certain number of units that will be rented or sold at below-market
12 rates to persons with lower than median incomes.  See SMC 23.58C.050.  The "payment
13 option" involves contributing cash to the City of Seattle, calculated as a specific amount
14 per square foot of the development, which will be deposited into a special account to be
15 used for purposes outlined in RCW 36.70A.540.  See SMC 23.58C.040.  Applicants may
16 seek modification of MHA requirements in the manner set forth in SMC 23.58C.035,
17 which authorizes the Director of the Seattle Department of Construction & Inspections
18 ("SDCI") to reduce or waive the amount of performance or payment if an applicant "can
19 demonstrate facts supporting a determination of severe economic impact at such a level
20 that a property owner's constitutional rights may be at risk."  SMC 23.58C.035(C)(1).
21         In this context, a "severe economic impact" exists if the MHA requirements will
22 either (a) deprive the property owner of "all economically beneficial use of the property,"
23

ORDER - 3

1   or (b) reach "the level of an undue burden that should not be borne by the property

2   owner." SMC 23.58C.035(C)(3).  The latter "undue burden" analysis involves weighing

3   the following nonexclusive factors:  (a) the severity of the economic impact; (b) the

4   degree to which the MHA requirements were or could have been anticipated; (c) the

5   extent to which alternative uses of the property or different configurations of the

6   proposed development would alleviate the need for a waiver or reduction; (d) the extent

7   to which any economic impact was caused by the property owner's decisions; and

8   (e) other factors relevant to whether the burden should be borne by the property owner.

9   SMC 23.58C.035(C)(4).

10         Plaintiff asserts that, although she could have paid the roughly $800,000 originally

11  estimated to design and construct new townhomes on her property, she could not have

12  also afforded either the expenses associated with the MHA's "performance option" or the

13  cash contribution connected to the MHA's "payment option."  Plaintiff, however, never

14  sought a modification or waiver pursuant to SMC 23.58C.035(C).  In her declaration,

15  plaintiff explains that she failed to request such relief because she "learned that waiver

16  requests must be submitted alongside a completed permit application."  Adams Decl. at

17  ¶ 41 (docket no. 35).  She does not indicate how she "learned" this information, but she

18  refers to an email from Katrina Nygaard, a Land Use Planner employed by the City of

19  Seattle, and she contends Nygaard indicated that she "could not seek a waiver before

20  submitting a permit application" and that she "wouldn't obtain a waiver anyway." Id. at

21  ¶ 46.  Plaintiff has entirely misrepresented what Nygaard said in her communication to

22  plaintiff.

23

ORDER - 4

On August 9, 2022, in response to plaintiff's inquiry from the previous day, Nygaard wrote:

> Thank you for your questions and contacting SDCI.  You have done a lot of research into the requirements and process and, unfortunately, we can't give any assurance that your request to waive or modify the MHA requirements would be approved.  These requests are rare and the burden of proof you'd have to provide to meet the criteria can be difficult to meeting [sic].  The application review process is led by David VanSkike in our offices and so he'd be the best person to contact if you have questions: david.vanskike@seattle.gov.

Ex. 3 to Adams Decl. (docket no. 35-3).  Nygaard also suggested that plaintiff consider building a detached accessory dwelling unit ("DADU"), which "would not trigger MHA requirements," and provided a link to the Seattle Municipal Code's DADU provisions. *Id.*  Nowhere in her message did Nygaard tell plaintiff that she "could not seek a waiver before submitting a permit application" or that she "wouldn't obtain a waiver anyway."  Rather, Nygaard provided to plaintiff the contact information for the person at SDCI who could best answer her questions and assist her, namely David VanSkike.

Had plaintiff contacted VanSkike, who is the Policy Lead in SDCI's Policy and Technical Group, which has primary responsibility for implementing the MHA program, plaintiff would have been told that she may seek a waiver or reduction of the MHA performance or payment requirements in either of two ways:  (i) within a master use permit or construction permit application; or (ii) in a stand-alone "special exception" application.  VanSkike Decl. at ¶¶ 1, 3, & 7 (docket no. 30).  In other words, VanSkike would have informed plaintiff that she was not required to apply for a permit before or contemporaneously with an MHA waiver request.  Plaintiff did not, however, contact

ORDER - 5

VanSkike, see id. at ¶ 7, and she never asked for a waiver pursuant to SMC 23.58C.035, which would have required only a description of the requested waiver, the identity of the property owner and date of acquisition, a statement concerning the current use of the property, documentation explaining and supporting the claim of economic impact, and an explanation of why a different development configuration would not alleviate the need for the waiver, see SMC 23.58C.035(C)(6).  Plaintiff also never applied for a permit.

Instead, plaintiff filed suit.  In this litigation, plaintiff presents both facial and as-applied challenges to the MHA, alleging that the MHA effectuates an unconstitutional uncompensated regulatory taking of private property.  See Compl. at ¶¶ 14–16 & 118–148 (docket no. 1).  Plaintiff seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 1983.  Defendant City of Seattle has moved for summary judgment on grounds that (i) plaintiff's facial attack lacks merit and is time barred, and (ii) plaintiff's as-applied claim is not ripe for judicial determination.[3]

**Discussion**

**A.      Facial Challenge**

The Takings Clause of the Fifth Amendment, made applicable to the States and their municipalities through the Fourteenth Amendment, does not entirely prohibit the taking of private property, but rather imposes a condition on the exercise of such governmental power, namely the provision of "just compensation."  See Lingle v.

---

[3] This jurisdictional argument would have been more appropriately brought in a motion to dismiss pursuant to Federal Rule of Civil Procedure 12, and the Court would have preferred to address it at an earlier stage of the case.

*Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005).  The role of the Takings Clause is to ensure that particular individuals are not forced to "alone . . . bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 537.  In considering a challenge to a governmental action or regulation relating to private property, the Court must first evaluate whether a taking has occurred.

        A per se or categorical taking involves either "a permanent physical invasion" of private property or a law or decision that deprives the owner of "*all* economically beneficial us[e]" of the property.  *Id.* at 538 (emphasis and alteration in original, quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)); *see also Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998).  Aside from per se or categorical takings, determining whether the government has engaged in a taking requires "an ad hoc, factual inquiry," *see Garneau*, 147 F.3d at 807, which is governed by the standards set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978),[4] or, with respect to land-use exactions, *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994).[5]  *See Lingle*, 544

---

[4] In *Penn Central*, the Supreme Court outlined several factors relevant to whether a "taking" has occurred, primarily "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," as well as the "character of the governmental action" (for example, a physical invasion or an interference arising from "some public program adjusting the benefits and burdens of economic life to promote the common good").  438 U.S. at 124.

[5] "Read together, *Nollan* and *Dolan* establish a three-part test.  First the court asks whether government imposition of the exaction would constitute a taking.  Second is the 'essential nexus' test, which asks whether the government has a legitimate purpose in demanding the exaction.  Third is the 'rough proportionality' test, which asks whether the exaction demanded is roughly proportional to the government's legitimate interests." *Garneau*, 147 F.3d at 809.

1  U.S. at 538; see also id. at 548 (indicating that "a plaintiff seeking to challenge a
2  government regulation as an uncompensated taking of private property may proceed . . .
3  by alleging a 'physical' taking, a Lucas-type 'total regulatory taking,' a Penn Central
4  taking, or a land-use exaction violating the standards set forth in Nollan and Dolan").

5        Plaintiff alleges that the MHA accomplishes a per se physical taking, requiring
6  plaintiff to construct housing and rent it to tenants "she does not know or desire."  Pl.'s
7  Mot. at 12 (docket no. 34).  As a facial challenge, this theory fails.  To prevail on a facial
8  attack, plaintiff must show that the "mere enactment" of the MHA constitutes a taking.
9  See Garneau, 147 F.3d at 811 (citing Carson Harbor Vill. Ltd. v. City of Carson, 37 F.3d
10 468, 473–74 (9th Cir. 1994)).  The "mere enactment" of the MHA did not give rise to a
11 physical taking for three reasons.  First, the "performance option" on which plaintiff
12 premises her per se physical taking analysis applies only when an owner of property
13 within certain land-use zones seeks to construct a new structure (other than a DADU) or
14 alter an existing structure in a manner that increases the number of units on the property.
15 SMC 23.58C.025(B).  In the absence of such development efforts, the MHA is essentially
16 dormant and has no effect on private property.  Second, the MHA provides an alternative
17 to the "performance option," and a property owner may elect the "payment option" and
18 thereby avoid any physical taking.  Third, the MHA contains provisions for seeking a
19 waiver of the "performance option," as well as the "payment option," which render the
20 ordinance subject to discretion, and not automatic or self-effectuating.  Indeed, as
21 indicated by SDCI Policy Lead VanSkike, the City has previously granted an application
22 for waiver or reduction, see VanSkike Decl. at ¶ 3 (docket no. 30), which undermines
23

ORDER - 8

plaintiff's contention that the "mere enactment" of the ordinance constituted a taking. Plaintiff's claim of a per se physical taking is further belied by the language of the MHA waiver provisions, which is consistent with takings jurisprudence, guiding the SDCI Director to examine whether the MHA requirements deprive the property owner of all economically beneficial use (the *Lucas* standard) or place an undue burden on the property owner (an inquiry that harkens back to the underlying principles of the Takings Clause).

Plaintiff further asserts that the MHA operates as a land-use exaction that, on its face, violates the requirements of *Nollan* and *Dolan*. This argument ignores the waiver provisions of the MHA, which allow the SDCI Director to examine the "essential nexus" and "rough proportionality" of the MHA's "performance option" or "payment option," as envisioned by *Nollan* and *Dolan*, before imposing them on a property owner who asserts that such conditions of a permit would have a severe economic impact. The fact-specific inquiry contemplated by *Nollan* and *Dolan*, as well as SMC 23.58C.035(C), does not lend itself to a facial challenge, which is why the Ninth Circuit does not recognize facial takings claims relating to land-use exactions. *See Garneau*, 147 F.3d at 811; *Koontz Coalition v. City of Seattle*, No. C14-218, 2014 WL 5384434, at *4 & n.1 (W.D. Wash. Oct. 20, 2014). Plaintiff's facial attack on the MHA lacks merit, and City of Seattle's motion for summary judgment as to plaintiff's facial takings claim is GRANTED.[6]

---

[6] In light of this ruling, the Court does not address City of Seattle's separate argument that plaintiff's facial challenge is time-barred.

ORDER - 9

**B.     As-Applied Challenge**

In contrast to a facial attack, an as-applied challenge "involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation." Garneau, 147 F.3d at 811 (quoting Carson Harbor Vill., 37 F.3d at 474). City of Seattle contends that plaintiff has not presented a justiciable as-applied takings claim. For purposes of Article III justiciability, an actual controversy exists when the dispute is (i) "definite and concrete, touching the legal relations of parties having adverse legal interests," and (ii) "real and substantial," seeking "specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." See MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007) (quoting Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240–41 (1937)); see also Koontz Coalition, 2014 WL 5384434, at *3. Plaintiff's as-applied attack on the MHA does not satisfy this standard.

In the context of an alleged regulatory taking, the Court must refrain from "consider[ing] the claim before the government has reached a 'final' decision." See Pakdel v. City & County of San Francisco, 594 U.S. 474, 475 (2021). Although the Pakdel Court clarified that the exhaustion of state remedies is not a prerequisite to an action under 42 U.S.C. § 1983, id., it reiterated that, for a claim to be ripe, the government must have at least "committed to a position" and thereby caused an actual injury to the plaintiff, id. at 479. For example, in Pakdel, the City of San Francisco refused the petitioners' request to be excused from a lifetime lease requirement associated with the conversion of a multiunit residential building into condominiums. Id. at 475–76.

ORDER - 10

1 No question existed about the City of San Francisco's position, id. at 478 ("'execute the
2 lifetime lease' or face an 'enforcement action'"), and the regulatory takings claim in
3 Pakdel satisfied the "relatively modest" requirement of finality to be considered ripe, id.

4      No similar indicia of ripeness exists in this matter.  No waiver request has been
5 made, and no decision has been issued by the City of Seattle concerning whether plaintiff
6 would be subject to the MHA's "performance option" or "payment option."  No permit
7 has been sought and no condition or exaction has been imposed.  Plaintiff's theory that
8 she should not have to risk paying an architect and the expenses of seeking a permit when
9 she does not know if SDCI would grant her a waiver is premised on a misperception of
10 the advice given by Land Use Planner Nygaard and an apparent failure to read and/or
11 comprehend the challenged ordinance.  This case does not yet concern "the particular
12 impact of a government action on a specific piece of property," Garneau, 147 F.3d at
13 811, and plaintiff's as-applied challenge must be dismissed as prematurely filed.  See
14 Koontz Coalition, 2014 WL 5384434, at *5 (holding that as-applied claims premised on
15 "uncertain or contingent future events" that might not occur as anticipated or even at all
16 were "unfit for judicial determination").

**Conclusion**

     For the foregoing reasons, the Court ORDERS:

     (1)     Defendant City of Seattle's motion for summary judgment and to exclude plaintiff's experts' opinions, docket no. 27, is GRANTED in part and STRICKEN in part as moot.  The Court concludes, as a matter of law, that plaintiff's facial challenge to the Mandatory Housing Affordability for Residential Development ordinance, codified as

ORDER - 11

SMC Chapter 23.58C, lacks merit, and judgment shall be entered in favor of City of Seattle and against plaintiff Anita Adams on such claim.  Plaintiff's as-applied challenge to the ordinance is DISMISSED without prejudice as unripe and not yet a justiciable case or controversy.  The portion of the City of Seattle's motion seeking to exclude plaintiff's experts' opinions is STRICKEN as moot.

        (2)    Plaintiff's cross-motion for summary judgment, docket no. 34, is DENIED.

        (3)    The Clerk is directed to enter judgment consistent with this Order, to send a copy of this Order and the Judgment to all counsel of record, and to CLOSE this case.

IT IS SO ORDERED.

Dated this 28th day of June, 2024.

*[signature]*

Thomas S. Zilly
United States District Judge

ORDER - 12